UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ABDOUL MALIK TAHIROU, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| NEW HORIZON ENTERPRISES, LLC, | : | FEBRUARY 28, 2020 |
| | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |
| | : | |

## COMPLAINT

Plaintiff Abdoul Malik Tahirou (hereinafter "Plaintiff") by and through his undersigned counsel Carey & Associates, P.C., files this Complaint against the Defendant New Horizon Enterprises, LLC (hereinafter, "NHE" or "Defendant"). Plaintiff alleges as follows:

### I.     PRELIMINARY STATEMENT

1.     Plaintiff's asserts the following claims: (1) failure to pay wages in violation of the Fair Labor Standard Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; (2) failure to pay wages in violation of Conn. Gen. Stat. § 31-72; (3) breach of oral contract; (4) unjust enrichment; (5) common law and statutory vexatious litigation; and (6) breach of covenant of good faith and fair dealing.

### II.     JURISDICTION AND VENUE

2.     This Court, in accordance with 28 U.S.C. §1331 and 29 U.S.C. §§ 201 *et seq.* As to those claims not arising under federal law but clearly so related to the claims in this action within the original jurisdiction of this Court, supplemental jurisdiction exists pursuant 28 U.S.C. § 1367.

3.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut and all parties reside in this District.

**III.     PARTIES**

4.     At all times relevant to this action, Plaintiff is and has been a Connecticut resident with an address in Norwalk, Connecticut.

5.     At all times relevant to this action, NHE is and has been a Connecticut corporation that has its principal place of business, as reported in the Connecticut Secretary of State website, at 30 Echo Lake Road, Watertown, Connecticut 06795. According to the Defendant's website, [www.newhorizonct.org](www.newhorizonct.org), the company also lists a corporate address at 51 Depot Street, Suite 203, Watertown, Connecticut 06795.

6.     NHE provides individualized, person centered support designed to improve the lives of people living with disabilities.

**IV.     STATEMENT OF FACTS**

7.     The Fair Labor Standards Act requires employers to pay employees a minimum wage and additionally to pay employees overtime compensation at a rate of time and a half or normal pay when they work more than forty hours in a given week.  FLSA 29 U.S.C. § 206(a).

8.     On January 1, 2015 (the effective date of the rule), the United States Department of Labor issued a Final Rule requiring employers to pay minimum and overtime wages to home healthcare employees. In addition, employers will be required to maintain recordkeeping of hours worked.  29 C.F.R. 552.

9.     In or about 2015, Plaintiff was employed by a home health agency called Employment Options.  It was during Plaintiff's time employed by Employment Options that he first met Betty Johnson, the program supervisor of NHE.

10.     While at Employment Options, Plaintiff became the primary caregiver of his one and only client.  The client is a quadriplegic, who needs total and constant assistance.

11.     The client requires 24 hours of care each day.  Plaintiff worked with the client Mondays through Fridays from 6:00 pm to 11:00 am and was relieved by another worker.  On the weekends, because no one relieved him, Plaintiff worked 24 hours each weekend day. Plaintiff did not live in the client's home and maintained his own residence.

12.     Plaintiff's responsibility for the client was total. Plaintiff did everything for him including, but not limited to, cooking, cleaning, bathing, doing laundry, grocery shopping, paying bills and managing his finances.  Furthermore, due to the nature of the client's injuries, Plaintiff was required to turn him over in bed during the night every three hours.

13.     In December 2017, Plaintiff resigned from Employment Options. Plaintiff informed the client's family of his departure from Employment Options, which, unfortunately, signified the end of his care of the client.  However, the client and his family really wanted Plaintiff to continue in his capacity as the client's primary caregiver.

14.     Plaintiff, therefore, approached Ms. Johnson about working out a deal where he would become an employee of NHE and would continue providing care to his client.

15.     Ms. Johnson represented to Plaintiff that his client's case would generate a gross yearly salary of a little over $100,000.  Plaintiff and Ms. Johnson negotiated Plaintiff's wages and agreed that he would be paid (1) $1000 per week, which was to be paid biweekly plus (2) an amount equivalent to 40% of the total annual amount of the client contract (after expenses), which amount was to be paid to Plaintiff on a quarterly basis on or before thirty (30) days after the end of each quarter. NHE made no mention or representation that it would pay minimum and overtime wages to Plaintiff.  The entire contractual arrangement was illegal in light of the fact that Plaintiff was a nonexempt domestic home care employee working pursuant to Connecticut wage and hour law and the FLSA.

16.     Plaintiff fully intended that the terms of his compensation be committed to a writing. However, once he agreed to work with Ms. Johnson and NHE, everything went into overdrive. He officially began working full-time for NHE on December 17, 2017 as the client's house manager.  However, at that time, Plaintiff had not signed any documents to evidence his employment by NHE.  Ms. Johnson explained to him that she had to act very quickly to sign the client to NHE before the client and/or his family could change their minds and sign with another agency.  As noted, the haste was unnecessary as the client and his family specifically requested Plaintiff's services, such that whatever agency he became affiliated with would be able to sign the client.

17.     On or about January 2018, Ms. Johnson brought to the client's residence a bunch of paperwork, which she called the "new hire package."  NHE was located about one hour away from the client's residence and, because there was no one available to relieve Plaintiff, Ms. Johnson had to come to the house with the paperwork.

18.     Apparently, included in the "new hire package" was a noncompete agreement (the "Agreement").  Plaintiff had never seen or signed such a document before.  Nothing in the package was ever explained to him and Ms. Johnson did not give him an opportunity to ask any questions.  She was in a hurry to get the documents and demanded that Plaintiff sign and/or initial the documents.  Plaintiff was not given the chance to read the documents, which he ordinarily would always do.  Importantly, he was never given a copy of the documents he signed in the "new hire package," including the Agreement.

19.     Had Plaintiff been aware of the restrictions imposed by the Agreement on his employment opportunities, he would not have signed the document.  Plaintiff also believed that

if he had refused to sign the Agreement, Ms. Johnson still would have hired him given her apparent desperation to obtain Plaintiff's client as a client of NHE.

20.     NHE would bill the State of Connecticut weekly for the cost of Plaintiff's client's care. The State, through Allied Community Resources ("Allied"), would then pay NHE bi-weekly for its services.

21.     With respect to Plaintiff's client's care, team meetings would be held every three months. The meetings were attended by the client, case worker Kadieja Fountain, Ms. Johnson and Plaintiff.  The purpose of the team meetings was to clearly assess client's needs every three months.

22.     On at least three occasions in a team meeting, the client expressed his immense displeasure with NHE.  The client made his displeasure known to Ms. Johnson and to the case worker.  He was having very serious issues with NHE, primarily with regards to how Plaintiff was being treated.  It was clear to the client that Plaintiff was getting burned out because NHE did not have reliable staff either to relieve him or to properly undertake the duties.  In fact, NHE had terminated approximately seven individuals within a very short period of time.  The client would have to consistently deal with staff that was never on time or lazy.  The effect was that Plaintiff was always working and had to cancel vacations because he was the only person on who the client relied upon.  NHE did nothing to remedy the situation.

23.     About six months after Plaintiff signed with NHE, Plaintiff happened upon the client's case file, which reflected the figures, including payments being made to NHE for his care.  The figures were not the same figures as were represented to Plaintiff by Ms. Johnson when Plaintiff's wages were being negotiated.  After doing his own investigation and based on his calculations, Plaintiff determined that the case would not gross over $100,000 (as stated by Ms.

Johnson) but approximately $230,000 annually. After reviewing the client's case file, Plaintiff called Allied, the firm that paid NHE on behalf of the State of Connecticut. Allied verified the rate as stated in the client's files.

24. After the realization that Ms. Johnson had grossly misrepresented the value of the client's contract with NHE to him, Plaintiff reached out via telephone calls and text to Ms. Johnson several times to discuss the issue. However, all his efforts were futile and eventually she completely stopped responding his telephone calls or texts.

25. It was clear to Plaintiff at this point that Ms. Johnson did not expect to be caught in her lies to him and was doing everything in her power to avoid dealing with him. She always knew the exact value of the client contract with her agency and chose to misrepresent that amount in order to induce Plaintiff to stay with the client at NHE.

26. Throughout Plaintiff's tenure of employment with NHE, he would submit a weekly time sheet. Each week Plaintiff reported 133 hours per week for the care of the client. His weekly wages were paid via a payroll check, but included no overtime compensation during the period from December 17, 2017 through May 1, 2019.

27. In addition, Plaintiff's quarterly wages were never timely paid to him and was never for the correct amount but for substantially less than the agreed amount. In at least one instance, Plaintiff was paid one month after Plaintiff was to receive his quarterly payment.

28. In 2018, Plaintiff's March quarterly check was to be paid to him on or before April 30, 2018. Instead, Plaintiff received that payment by check dated May 4, 2018 in the amount of $7,364.73. The check had a notation written on the memo line for "Profit Sharing: Client BM." As noted, Plaintiff was to be paid $14,928.79 per quarter. Therefore, NHE owes Plaintiff $7,564.06 for the first quarter of 2018.

29. Plaintiff's June quarterly check was due on or before July 30, 2018. Instead, he received that payment in the form of two checks dated August 28, 2018 for $3,336.50 each for a total sum of $6,673.00. Plaintiff cashed one check and deposited the other. The check had an almost indecipherable notation written on the memo line, but it appears to state for "BM Profit Sharing 4/18-6/18." As noted, Plaintiff was to be paid $14,928.79 per quarter. Therefore, NHE owes Plaintiff $8,255.79 for the second quarter of 2018.

30. Plaintiff's September quarterly check was due on or before October 30, 2018. Instead, Plaintiff received that payment by check dated November 1, 2018 in the amount of $6,732.15. The check had a notation written on the memo line for "BM Profit Sharing Jul-Sep 2018." As noted, Plaintiff was to be paid $14,928.79 per quarter. Therefore, NHE owes Plaintiff $8,196.64 for the third quarter of 2018.

31. Plaintiff's December quarterly check was due on or before January 30, 2019. Instead, Plaintiff received that payment by check dated February 4, 2019 in the amount of $7,362.00. The check had a notation written on the memo line for: "BM Profit Share." As noted, Plaintiff was to be paid $14,928.79 per quarter. Therefore, NHE owes Plaintiff $7,566.79 for the fourth quarter of 2018.

32. Consequently, for the portion of his wages that was to be paid quarterly, Plaintiff received a total of $28,131.88 for 2018, when he should have received $59,715.14. Therefore, NHE owes Plaintiff $31,583.26 from his quarterly wages for 2018. However, because NHE failed to correctly pay wages pursuant to Connecticut wage and hour laws and the FLSA, NHE grossly underpaid Plaintiff, including failing to pay him overtime compensation.

33. Plaintiff's first quarterly check for 2019 of $14,928.79 was due on or before April 30, 2019. Plaintiff made several attempts to collect his quarterly wages and, after repeated requests,

Ms. Johnson refused to pay him.  Therefore, NHE owes Plaintiff $14,928.79 for the first quarter of 2019.

34. Plaintiff was not paid his weekly wages for the two-week period starting February 25, 2019 to March 10, 2019 (or $1000 x 2 = $2000).  The pay date for that check would have been March 15, 2019.  Plaintiff made several attempts to collect his weekly pay and Ms. Johnson refused to pay him.

35. In the seventy-one (71) weeks and three (3) days that Plaintiff worked for NHE, Plaintiff was never paid for a single hour of overtime.

36. In the seventy-one (71) weeks and three (3) days that Plaintiff worked for NHE, Plaintiff was never paid for a single hour of vacation time or holiday time.

37. Because NHE refused to pay Plaintiff his weekly pay for the period indicated above and refused to pay him his quarterly pay despite repeated demands, on May 1, 2019, Plaintiff was left with no choice but to quit his position with NHE.

38. On or about May 5, 2019, Plaintiff applied for unemployment compensation benefits with the Connecticut Department of Labor.

39. On May 21, 2019, a telephonic hearing was held by the Connecticut Department of Labor to determine if Plaintiff was eligible for such benefits due to his "voluntary leaving" the position. NHE did not participate in the hearing.

40. On May 30, 2019, the Connecticut Department of Labor determined that Plaintiff was eligible for unemployment benefits, effective May 5, 2019 at a weekly amount of $517.00.

41. On June 3, 2019, the State of Connecticut Unemployment Office held that Plaintiff was awarded unemployment compensation benefits even though he quit his employment due to the Defendant's failure to pay his wages.

42.     On or about June 10, 2019, NHE appealed the determination that Plaintiff was eligible for benefits, although the reasons for the appeal were unclear.  On September 24, 2019, the State of Connecticut, Employment Security Appeals Division mailed Plaintiff a Notice of Hearing Before a Referee scheduling a telephonic hearing (the "Hearing") on October 8, 2019 at 1:00 pm with respect to NHE's appeal.

43.     On June 26, 2019, Connecticut Governor Ned Lamont signed into law Public Act No. 19-117. Section 305 of the Act provides:

> (NEW) (Effective from passage) For purposes of this section "covenant not to compete" means any contract or agreement that restricts the right of an individual to provide homemaker, companion or home health services (1) in any geographic area of the state for any period of time, or (2) to a specific individual. **Any covenant not to compete is against public policy and shall be void and unenforceable.**

C.G.S.A.P.A. 19-117, § 305 (2019) (emphasis in original). As stated in the provision, Section 305 became effective on June 26, 2019. Consequently, the provision was in effect on the date of the Defendant "filed" a vexatious summons and complaint on October 17, 2019 against Plaintiff for allegedly breaching a noncompete agreement. (*New Horizon Enterprises, LLC v. Aboul Malik Tahirou, LLI-CV19-6023662-S* (*Conn.Super. Litchfield JD*)). The Complaint ("Complaint") purported to assert four causes of action: Count 1 (Breach of Non-Competition); Count 2 (Breach of non-solicitation of customers); Count 3 (Amount of Damages); and Count 4 (Legal Fees and Costs).

44.     On October 8, 2019, the parties attended an unemployment appeals hearing.

45.     On October 16, 2019, the Decision of the Appeals Referee (the "Decision") was mailed to the parties.  The Referee concluded that Plaintiff had shown good cause to quit because NHE repeatedly failed to pay him his wages in a proper and timely manner, despite numerous requests, in violation of federal or state statute or regulation.  Therefore, the Decision affirmed

the administrator's determination that Plaintiff was entitled to benefits and dismissed Employer's appeal.

> The record reveals the employer repeatedly failed to provide the claimant with wages due to him at the time the wages came due. The Board of Review has found that a claimant has good cause attributable to the employer to leave work where the employer violates a state or federal statute or regulation governing the payment of wages and the violation has an adverse effect upon the claimant. . .The administrator's determination is affirmed, and the employer's appeal is dismissed. Benefits are awarded, effective May 5, 2019, provided the claimant is otherwise eligible.

46. On or about November 6, 2019, NHE further appealed the Decision arguing (among other things) that the Appeals Referee improperly determined (1) that Plaintiff had shown "good cause" for leaving NHE's employ and (2) that NHE repeatedly failed to pay Plaintiff wages when they became due.

47. On or about December 20, 2019, the decision of the Board of Review was mailed to the parties. That decision found the findings and conclusions of the Appeals Referee supported by the record and by applicable law. Accordingly, the Referee's decision was affirmed and the appeal dismissed.

48. Plaintiff was employed by NHE for a total of seventy-one (71) weeks and three (3) days, from December 17, 2017 through May 1, 2019. During that entire time, Plaintiff took nine (9) vacation days and he worked every holiday. As stated, during that time, Plaintiff worked seventeen (17) hours each day from Monday to Friday and twenty-four (24) hours each on Saturday and Sunday. Therefore, Plaintiff worked a minimum of 133 hours each week, inclusive of 93 hours of overtime each week during the above period of time, he was never compensated for overtime at a rate of time and a half.

49. On November 29, 2019, Plaintiff filed a Motion to Strike the Complaint in *New Horizon Enterprises, LLC v. Aboul Malik Tahirou, LLI-CV19-6023662-S* (*Conn.Super. Litchfield JD*) on

the grounds that (among other things) the subject Agreement could not be enforced as a result of new noncompete law enacted on June 26, 2019.  The new law made void and unenforceable as against public policy any covenant not to compete held by a home health care worker, such as Plaintiff. *See* C.G.S.A. P.A. 19-117, § 305 (2019).

50. On December 20, 2019, the State of Connecticut Department of Labor Employment Security Appeals Division Board of Review issued a written decision affirming the appeal referee's decision to grant benefits to Plaintiff and the appeal was dismissed.

51. On December 27, 2019, NHE withdrew the Superior Court Complaint, *New Horizon Enterprises, LLC v. Aboul Malik Tahirou,  LLI-CV19-6023662-S* (*Conn.Super. Litchfield JD*) without explanation.

52. Plaintiff asserts the lawsuit filed against him by NHE to be baseless, willful, and intended to undermine his attempt to recover outstanding wages owed to Plaintiff.

**V.     CAUSES OF ACTION**

**COUNT ONE (Failure to pay wages under FLSA, 29 U.S.C. §§ 201 *et seq.*)**

53. Plaintiff repeats and realleges ¶¶ 1-52 above as if fully set forth herein.

54. Plaintiff can successfully establish that Defendant has willfully and intentionally denied him wages to which he is owed pursuant to the FLSA.

55. Plaintiff was not paid 93 hours of overtime every week during the time period of December 17, 2017 through May 1, 2019.

56. Plaintiff does not fall under any exemptions that would exclude him from overtime compensation.

57. Defendant imposed this overtime work on Plaintiff and knowingly and intentionally did not pay Plaintiff overtime compensation.

58. Plaintiff is owed back wages as well as liquidated damages and attorneys fees for Defendant's willful wage violations.

59. Defendant should be held liable on this count and all appropriate relief be awarded to Plaintiff.

### COUNT TWO (Failure to pay wages under Conn. Gen. Stat. § 31-72)

60. Plaintiff repeats and realleges ¶¶ 1-59 above as if fully set forth herein.

61. Connecticut's wage statute reads as follows: "When any employer fails to pay an employee wages… such employee… may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court…" C.G.S. § 31-72. Wages are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." C.G.S. § 31-71a(3).

62. Plaintiff can successfully establish that Defendant has willfully and intentionally denied him wages to which he is owed pursuant to the C.G.S. § 31-72.

63. Plaintiff was not paid 93 hours of overtime every week during the time period of December 17, 2017 through May 1, 2019.

64. Plaintiff does not fall under any exemptions that would exclude him from overtime compensation.

65. Defendant imposed this overtime work on Plaintiff and knowingly and intentionally did not pay Plaintiff overtime compensation.

66. Plaintiff is owed back wages as well as liquidated damages and attorney's fees for Defendant's willful wage violations.

67. Defendant should be held liable on this count and all appropriate relief be awarded to Plaintiff.

## COUNT THREE (Breach of oral contract)

68. Plaintiff repeats and realleges ¶¶ 1-67 above as if fully set forth herein.

69. Plaintiff negotiated a verbal contract with the Defendant whereby Defendant would pay Plaintiff 40% profit of the contract to care for Plaintiff's client. The total amount of the contract for services was approximately $230,000. Defendant breached the agreement by failing to pay Plaintiff 40% of the profit of the contract price and paid him a different amount. The sole purpose of the contract was for Plaintiff to provide home healthcare duties to his client. Defendant also agreed to make quarterly payments to Plaintiff but Defendant breached the agreement by failing to pay such quarterly payments to Plaintiff.

70. Defendant should be held liable on this count and all appropriate relief be awarded to Plaintiff.

## COUNT FOUR (Unjust enrichment)

71. Plaintiff repeats and realleges ¶¶ 1-70 above as if fully set forth herein.

72. Plaintiff was a nonexempt employee and entitled to minimum and overtime compensation while working for the Defendant from December 17, 2017 through May 1, 2019. Plaintiff contracted with Defendant to receive a 40% profit interest from his work with the Client, Defendant refused to pay such 40% profit interest and breached the oral agreement.

73. Defendant received an immediate benefit from Plaintiff when it demanded he worked overtime hours without being paid overtime compensation, to Plaintiff's detriment.

74. Plaintiff is entitled to, and as justice so requires, equitable damages in the amount of the total overtime compensation.

75. Defendant should be held liable on this count and all appropriate relief be awarded to Plaintiff.

### COUNT FIVE (Vexatious litigation)

76. Plaintiff repeats and realleges ¶¶ 1-75 above as if fully set forth herein.

77. Plaintiff asserts a cause of action for vexatious litigation. The cause of action for vexatious litigation permits a party who has been wrongfully sued to recover damages, inclusive of attorneys' fees and costs. This cause of action exists in common law and pursuant to statute C.G.S. § 52-568.

78. The Defendant filed an action captioned as *New Horizon Enterprises, LLC v. Aboul Malik Tahirou, LLI-CV19-6023662-S* (*Conn.Super. Litchfield JD*). The complaint lacked probable cause, was filed with malice and the lawsuit was terminated in Plaintiff's favor when Defendant withdrew the complaint.

79. On the date the aforementioned suit was filed against Plaintiff, Connecticut Governor Ned Lamont had already signed into law Public Act No. 19-117 on June 26, 2019. Section 305 of the Act provides:

> (NEW) (Effective from passage) For purposes of this section "covenant not to compete" means any contract or agreement that restricts the right of an individual to provide homemaker, companion or home health services (1) in any geographic area of the state for any period of time, or (2) to a specific individual. Any covenant not to compete is against public policy and shall be void and unenforceable.

C.G.S.A.P.A. 19-117, § 305 (2019). The law applied retroactively to the purported noncompetition and nonsolicitation agreement allegedly entered into between Plaintiff and NHE. Presumptively, both NHE and its' legal counsel knew or should have known the statutory ban against noncompetition agreements for home health care employees existed, yet they filed the

14

above lawsuit with reckless indifference to Plaintiff's reputation and lacked probable cause on any claim.

80. Defendant should be held liable on this count and all appropriate relief be awarded to Plaintiff.

### COUNT SIX (Breach of Covenant of Good Faith and Fair Dealing)

81. Plaintiff repeats and realleges ¶¶ 1-80 above as if fully set forth herein.

82. Plaintiff acted with good faith in the exercise of his rights under any contract with the Defendant. At no time did Plaintiff commit a breach with regard to any contract with the Defendant.

83. Defendant acted with unreasonable disregard for Plaintiff's contractual rights and his rights to receive overtime compensation.

84. Defendant should be held liable on this count and all appropriate relief be awarded to Plaintiff.

### VI.   PRAYER FOR RELIEF

**WHEREFORE**, Abdoul Malik Tahirou hereby requests the following relief:

A. Award compensatory damages;

B. Award punitive damages;

C. Award attorneys' fees and costs;

D. Award pre-judgement interest;

E. Award post-judgement interest;

F. Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

                                  Respectfully Submitted,

                                  PLAINTIFF
                                  ABDOUL MALIK TAHIROU

                                  By:/s/ Mark P. Carey
                                  Mark P. Carey (ct17828)
                                  Carey & Associates, P.C.
                                  71 Old Post Road, Suite One
                                  Southport, CT 06890
                                  (203) 255-4150 tel
                                  (203) 255-0380 fax
                                  mcarey@capclaw.com