## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Abdoul Malik Tahirou,

                    Plaintiff,

v.

New Horizon Enterprises, LLC, *et al.*,

                    Defendants.

Civil No. 3:20-cv-00281 (SVN)

February 21, 2022

## RULING ON PLAINTIFF'S RENEWED
## APPLICATION FOR PREJUDGMENT REMEDY (ECF No. 79)

**I.    INTRODUCTION**

This is an action alleging violations of the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, violations of the Connecticut Wage Act ("CWA"), Conn. Gen. Stat. §§ 31-72 *et seq.*, and breach of an oral profit-sharing agreement.  (*See generally* Pl.'s Am. Compl., ECF No. 29.)  The first named defendant, New Horizons Enterprises, LLC ("New Horizons"), is a home care agency that contracts with the State of Connecticut to provide companionship and other services for persons with disabilities.  The Plaintiff, Abdoul Malik Tahirou, was one of New Horizons' "house managers" – that is, an employee who stays in the client's home and cares for him.  The Plaintiff claims to have had a compensation package composed of a $1,000 fixed weekly salary and a forty percent share of the net profits on the state contract for his patient.  He has sued New Horizons, its owner Janelle Lesinsky, and its program supervisor Betty Johnson.  He claims that his salary arrangement violated the FLSA and CWA, and that the Defendants breached the profit-sharing agreement.  (*Id*.)

The Plaintiff has applied for a prejudgment remedy in the amount of $538,692.  (Renewed Appl. for Prejudgment Remedy, ECF No. 79; *see also* Updated Damages Analysis, ECF No. 104-

1.)  He reckons the value of his FLSA and CWA claims at $156,550, and he claims $56,159 in unpaid profit-sharing.  (ECF No. 104-1, at 4-5.)  He then doubles both figures, contending that he is entitled to liquidated or double damages under the two statutes, and he adds an attorneys' fee claim of $113,274.  (*Id.* at 5.)  He also asks the Court to include pre- and post-judgment interest in his prejudgment remedy.  (ECF No. 79-1, at 14-15.)  Finally, he says that the prejudgment remedy should enter against Ms. Lesinsky and Ms. Johnson as well as New Horizons, because he says that they meet the test for "employer" liability under the FLSA and CWA.  (ECF No. 79-2, at 2-3.)

For the reasons that follow below, the court concludes that the Plaintiff is entitled to a prejudgment remedy, although not in the amount sought.  It also concludes that, while he is entitled to prejudgment remedies of differing amounts against New Horizons and Ms. Johnson, he is not entitled to such a remedy against Ms. Lesinsky.  As discussed in Section IV below, his application is therefore granted in part and denied in part.  He is granted a prejudgment remedy against New Horizons and Ms. Johnson jointly and severally in the amount of $39,218.22, and an additional prejudgment remedy against New Horizons in the amount of $157,269.16.  His request for entry of a prejudgment remedy against Ms. Lesinsky is denied.

## II.   BACKGROUND

The Plaintiff is an "independent living skills trainer."  (Tr. of Prejudgment Remedy Hrg., Aug. 17, 2021, at 7:11-16.) (hereinafter "Day 1 Hrg. Tr.").  He "take[s] care of disabled, brain injury patients" and "help[s] them to rehabilitate themsel[ves] and get back into society."  (*Id.* at 7:19-24.)  This includes "fill[ing] . . . every need that they need, either from cooking, cleaning, housekeeping, taking them to . . . appointment[s], bathing them, paying their bills, [and] running basically their day-to-day activities."  (*Id.* at 7:23-8:3.)

The Plaintiff initially worked for a company called Employment Options.  (*Id.* at 11:12-14.)  During his tenure there, he provided care for a client with the initials "BM."[1]  (*Id.* at 11:15-21.)  Among other duties, he cooked BM's meals, cleaned his house, transported him to medical appointments, and paid his bills.  (*Id.* at 12:4-6.)  BM was a wheelchair-bound quadriplegic who required "total care" around the clock, and the Plaintiff therefore slept in his house.  (*Id.* at 6-7.)

In 2017, the Plaintiff became dissatisfied with his compensation at Employment Options.  (*Id.* at 15:9-10.)  He began to explore leaving the company and taking the BM account with him.  He contacted Elizabeth "Betty" Johnson, a former Employment Options employee who had left the company in 2011.  (*See id.* at 74:3-4.)  Ms. Johnson had gone to work at New Horizons, a company that her daughter, Janelle Lesinsky, had formed in 2010.  (*Id.* at 75:11-12; *see also* Tr. of Prejudgment Remedy Hrg., Aug. 27, 2021, at 21:10) (hereinafter "Day 2 Hrg. Tr.").  Although the parties disagree on who first contacted whom, they agree that the Plaintiff discussed employment with New Horizons in December, 2017.  (Day 1 Hrg. Tr. at 17:20-24.)

The Plaintiff joined New Horizons later that month.  As memorialized months later in an "Offer of Rehire"[2] letter, he agreed to a "base work week schedule" of "Monday to Friday from 6pm to 11am," and "Saturday and Sunday from 11am-11am as a live in weekend shift."  (Pl.'s Hrg. Ex. 5.)  The parties further agreed that "[a]ll shifts include sleep time."  (*Id.*)  Additionally, they agreed that his "base compensation rate" for working this schedule would be "One Thousand ($1000.00) dollars per week."  (*Id.*)  The agreement added that "[a]ny hours in the base schedule that [the Plaintiff is] unable to work will be deducted from [his] base compensation," and any additional hours added, at a rate of $12 per hour.  (*Id.*)

---

[1]     To protect the client's medical privacy, the court will not use his full name in this ruling.

[2]     The letter was styled as a "rehire" letter because Ms. Johnson was apparently then under the impression that the Plaintiff had previously worked for New Horizons.

The Plaintiff's compensation package also included a profit-sharing component, but the parties never reduced it to writing and they now disagree on its particulars. New Horizons billed the State of Connecticut for BM's care (Day 1 Hrg. Tr. at 19:11-14; *see also* Pl.'s Hrg. Ex. 20), and the parties agreed that the Plaintiff would be paid a percentage of the State's payments each quarter after deductions for certain expenses. (Day 1 Hrg. Tr. at 44:7-25 (testimony of Plaintiff); 108:10-109:9 (testimony of B. Johnson).) They now disagree on the percentage, however, with the Plaintiff saying that New Horizons agreed to forty percent and the Defendants variously claiming that the figure was either fifteen or thirty percent. (*Compare id.* at 22:14-20 (testimony of Plaintiff, stating that he asked for "40 percent" and "Betty . . . agreed to the terms") *with id.* at 96:21-23 (testimony of B. Johnson, stating that the percentage "may have been 15") and Day 2 Hrg. Tr. at 30:3-5 (testimony of J. Lesinsky, stating that "I think it was 30 percent not 15 percent").) They also now disagree on the deductions, with the Plaintiff claiming that New Horizons could deduct only his fixed salary and the wages of the other caregivers who relieved him when he was off duty (Day 1 Hrg. Tr. at 45:13-19), and the Defendants contending that they could also deduct utilities, rent, and other administrative expenses. (*Id.* at 109:17-20.) In any event, after New Horizons failed to make the profit-sharing payments that he was expecting, the Plaintiff left the company on May 1, 2019. (*Id.* at 72:4-10.)

The Plaintiff then filed this lawsuit on February 28, 2020. (Compl., ECF No. 1.) He alleged that the base salary component of his compensation package violated the FLSA and CWA because it did not include overtime payments for 93 of the 133 hours that he worked each week. (*Id.* ¶¶ 53-67.) He also alleged that New Horizons breached the profit-sharing agreement when it failed to pay him forty percent of its net recoveries on the BM account. (*Id.* ¶¶ 68-70.) Finally, he asserted claims for unjust enrichment, breach of the covenant of good faith and fair dealing,

and vexatious litigation with respect to the Defendants' attempt to enforce a non-competition covenant.  (*Id.* ¶¶ 71-84.)

New Horizons responded to the complaint with a motion to compel arbitration.  (ECF No. 13; *see also* ECF No. 13-1 ("Employee Confidentiality Non-Solicit Non-Compete Agreement" with an attached "Arbitration Clause").)  The Plaintiff opposed the motion (ECF No. 14), but Judge Shea nonetheless granted it and directed the parties to arbitrate.  (ECF No. 16.)  Yet when New Horizons failed to initiate the very arbitration it had demanded (*see* ECF No. 17), Judge Shea reopened the case and the parties resumed the litigation.  (ECF No. 20.)

The Plaintiff amended his complaint on April 2, 2021.  (ECF No. 29.)  The amendments added two new causes of action for statutory theft and conversion.  (*Id.* ¶¶ 136-43.)  Most importantly for present purposes, however, the amended complaint also added three new defendants: Ms. Lesinsky, Ms. Johnson, and Joyce Michelle Carswell, who the Plaintiff alleges was "an owner/operator of" New Horizons.  (*Id.* ¶ 19.)  The Plaintiff then served the amended complaint on Ms. Johnson on April 5, 2021 and on Ms. Lesinsky on April 6, 2021.  (ECF Nos. 36, 37.)  He claims to have served Ms. Carswell on April 15, 2021 (ECF No. 48; *see also* ECF No. 128 (order by the Hon. Sarala V. Nagala, USDJ, questioning whether service was valid)), and when she failed to appear, he initiated default proceedings against her.  (ECF No. 66.)

Soon after he served Ms. Lesinsky and Ms. Johnson, the Plaintiff applied for a prejudgment remedy and moved for an order compelling the Defendants to disclose their assets.  (ECF Nos. 39, 41.)  Judge Shea referred the application and the motion to the undersigned.  (ECF No. 46.)  The court scheduled a prejudgment remedy hearing for May 19, 2021 (ECF No. 57), but canceled it when the parties reported that they had resolved the issue by negotiation.  The Plaintiff says that

the Defendants "agreed to post a $100,000 bond in exchange for [his] withdrawal of the . . . PJR application." (ECF No. 79, at 1.)

Claiming that the negotiated resolution had fallen apart, the Plaintiff renewed his prejudgment remedy application and motion for disclosure of assets a month later. (ECF No. 79.) He says that although the Defendants agreed to provide security, they "failed to actually post a bond as agreed." (*Id.* at 1.) Judge Shea then referred the renewed application and motion to the undersigned, who held a prejudgment remedy hearing over two days on August 17 and 27, 2021. (ECF Nos. 108, 113.) The court heard testimony from the Plaintiff, Ms. Johnson and Ms. Lesinsky, and admitted into evidence twenty-two documentary exhibits from the Plaintiff and four from the Defendants. (ECF No. 117.) Afterward, the court received post-hearing briefs from both parties (ECF Nos. 119, 120), and the last of the two hearing transcripts posted to the docket on December 28, 2021. (ECF No. 126.) The Plaintiff's application is therefore ripe for decision.

## III.   DISCUSSION

### A.   The Prejudgment Remedy Standard

In federal court, plaintiffs may use available state prejudgment remedies to secure satisfaction of the judgments they expect to win. Rule 64 of the Federal Rules of Civil Procedure provides that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing . . . property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). Local Rule 4(c) further provides that "a party may secure a pre-judgment remedy ('PJR') as permitted by, and in accordance with, the law of the State of Connecticut." D. Conn. L. Civ. R. 4(c).

Under Connecticut law, a court may grant an application for a prejudgment remedy if, after a hearing and "upon consideration of the facts before it and taking into account any defenses,

counterclaims or set-offs, claims of exemption and claims of adequate insurance," it finds "that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought." Conn. Gen. Stat. § 52-278d(a); *see also Morales v. Gourmet Heaven, Inc.*, No. 3:14-cv-1333 (VLB), 2015 WL 3869419, at *2 (D. Conn. June 23, 2015) ("*Morales I*"). Probable cause is a "*bona fide* belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Three S. Devel. Co. v. Santore*, 193 Conn. 174, 175 (1984) (quoting *Wall v. Toomey*, 52 Conn. 35, 36 (1884)) (quotation marks omitted). It is "a flexible common sense standard" that "does not demand that a belief be correct or more likely true than false." *Id.* (citing *Texas v. Brown*, 460 U.S. 730 (1983)). Instead, probable cause is determined by "weighing probabilities." *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 142 (2008). The probable cause standard is "less demanding than standards which require findings to be made based on a preponderance of the evidence or even a likelihood of success." *Cendant Corp. v. Shelton*, No. 3:06-cv-854 (JCH), 2007 WL 1245310, at *3 (D. Conn. Apr. 30, 2007). With respect to damages, "the plaintiff must demonstrate probable cause that a judgment will issue in an amount equal to, or greater than, the amount of the prejudgment remedy sought." *FloodBreak, LLC v. Art Metal Indus., LLC*, 520 F. Supp. 3d 167, 174 (D. Conn. 2021). "The amount of damages need not be determined with mathematical precision, but there must be a reasonable basis for measuring the plaintiff's loss." *Id.*

### B.   The Plaintiff's FLSA and CWA Claims

#### 1.   *Baseline principles*

Subject to certain exceptions that are not relevant here, both the FLSA and the CWA require employers to pay their employees a minimum wage. "Section 206 of the FLSA sets forth

a minimum hourly wage employers must pay their employees who engage in work affecting interstate commerce." *Santillan v. Henao*, 822 F. Supp. 2d 284, 291 (E.D.N.Y. 2011) (citing 29 U.S.C. § 206(a)(1)(C)). The federal minimum wage is $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). The CWA likewise require employers to pay a minimum wage, *see Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 263 n.2 (D. Conn. 2002) (observing that the Connecticut statute "provides wage . . . guarantees similar to the FLSA"), but Connecticut's minimum is higher than the federal minimum. The state minimum wage was $10.10 per hour at all times relevant to this case. Conn. Dep't of Labor, *History of Minimum Wage Rates*, https://www.ctdol.state.ct.us/wgwkstnd/wage-hour/history.htm (last visited Feb. 21, 2022).

Both statutes also require employers to pay time and a half for overtime. Section 207 of the FLSA "specifies that an employer must pay employees who work in excess of forty hours during a workweek for the excess hours 'at a rate not less than one and one-half times the regular rate at which he is employed.'" *Santillan*, 822 F. Supp. 2d at 291 (quoting 29 U.S.C. § 207(a)(1)). The CWA's overtime provision is similar. *See* Conn. Gen. Stat. § 31-76c ("No employer, except as otherwise provided herein, shall employ any of his employees for a workweek longer than forty hours, unless such employee receives remuneration for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."); *Morales v. Gourmet Heaven, Inc.*, No. 3:14-cv-1333 (VLB), 2016 WL 8254353, at *5 (D. Conn. Nov. 29, 2016) ("*Morales II*") ("Like the FLSA, the [CWA] overtime provision requires that employers pay employees one and one-half times the . . . regular rate for any hours over forty hours per week.").

Plaintiffs bear the burden of proving that they were not paid in accordance with the statutes, but in meeting this burden, the law makes allowances for the practical realities of the employment

relationship.  While the plaintiff must show "that he performed work for which he was not properly compensated," "[t]he remedial nature of this statute and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded on other grounds by* The Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251 *et seq.*  "Due regard must be given to the fact that it is the employer who has the duty under . . . the Act to keep proper records of wages [and] hours," and courts should likewise note that "employees seldom keep . . . [records of hours worked] themselves," and "even if they do, the records may be and frequently are untrustworthy."  *Id.*  "Therefore, the easiest way for an FLSA plaintiff to discharge his or her burden of proof is, generally, to 'secure the production of such records' from the employer, who has the duty for their maintenance under" the statute.  *Santillan*, 822 F. Supp. 2d at 294 (quoting *Anderson*, 328 U.S. at 687) (brackets omitted).  When the employer fails to produce complete records in discovery, thereby frustrating this "easiest" of methods, courts often permit plaintiffs to meet their burden "by relying on recollection alone."  *Arasimowicz v. All Panel Sys., LLC*, 948 F. Supp. 2d 211, 224 (D. Conn. 2013) ("An employee's burden to produce 'sufficient evidence' is low and can be met by that employee's 'recollection alone.'"); *see also Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 336 (S.D.N.Y. 2005).

### 2.    *Hours worked*

In this case, the parties have several disputes over the Defendants' compliance with the wage and hour statutes.  One such dispute concerns the number of hours the Plaintiff worked each week.  The parties do agree that the Plaintiff was present in BM's home for 133 hours in a normal week – that is, from 6:00 p.m. to 11:00 a.m. Monday through Friday, and for twenty-four hours on Saturdays and Sundays.  (*See* Pl.'s Hrg. Ex. 5.)  But the Defendants say that not all of these hours

count as compensable work, because the Plaintiff "slept an average of four and one-half to five hours per night," and "he is not entitled to be paid while sleeping." (ECF No. 119, at 2-3.) The Plaintiff counters that "there should be no deductions for 'sleep time,'" because "[t]he regulations make clear that 'sleep time' may only be deducted if it is 'regularly scheduled' and in excess of five hours, which [he] was never able to have due to the client's around-the-clock care demands." (ECF No. 120, at 6) (citing 29 C.F.R. § 785.22).

While the FLSA itself "is silent as to whether sleep time is compensable time," the United States Department of Labor's Wage and Hour Division "has promulgated interpretive rules addressing that exact issue." *Perez v. La Bella Vida ALF, Inc.*, No. 8:14-cv-2487-T-33TGW, 2015 WL 6157102, at *4 (M.D. Fla. Oct. 19, 2015). When an employee is on duty for a shift of less than twenty-four hours, but is allowed to sleep during his shift, 29 C.F.R. § 785.21 regards him as "working even though he is permitted to sleep . . . when not busy." So long as he is "required to be on duty," "the time is worktime." *Id.* When the employee's shift is twenty-four hours or more, he and his employer "may agree to exclude . . . a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked," but only if "adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep." 29 C.F.R. § 785.22(a). The Wage and Hour Division has "adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time." 29 C.F.R. § 785.22(b).

The Defendants cite two cases for the proposition that "sleep time is not compensable" (ECF No. 119, at 2), but neither one compels that result in the circumstances of this case. In *Reich v. New York City Transit Authority*, the Department of Labor sought an order compelling the Transit Authority to pay its Police Department canine handlers overtime for time spent transporting

10

their dogs to and from work.  45 F.3d 646, 647 (2d Cir. 1995).  The Department contended that, because "the obligation to walk or discipline the dog, or to clean up if the dog has become sick, or to communicate with the dog, can arise at any time during the commute . . . the entire duration of the commute is compensable work time."  *Id.* at 651.  The Second Circuit observed that this argument "goes too far;" because the need to discipline or communicate with a dog could arise anytime, even at night, "[a]cceptance of the DOL's arguments would require the conclusion that handlers must be compensated around the clock, waking and sleeping."  *Id.*  This one-sentence utterance does not carry the argument that all sleep time is non-compensable, regardless of circumstances.  And in *Clayton v. Delmarva Community Services, Inc.*, the employees were not on duty during their sleeping hours.  447 F. Supp. 3d 404, 410 (D. Md. 2020) (describing the question presented as whether plaintiffs, who slept on employer's premises, were entitled to compensation for sleep time "*between* their on-duty work hours") (emphasis added).  In the parlance of the FLSA, they were "waiting to be engaged" rather than "engaged to be waiting."  *Id.* at 412-13.

In this case, there is probable cause to believe that the Plaintiff will prevail on this point. His written employment agreement states that his "base work week schedule is Monday to Friday from 6pm to 11am, Saturday and Sunday from 11am-11am as a live in weekend shift" (Pl.'s Hrg. Ex. 5).  He testified that he maintained that schedule "through [his] whole tenure with New Horizon" (Day 1 Hrg. Tr. at 23:11-15), except for "a couple of days off."  (*Id.* at 35:9-11.)  While he was permitted to sleep during each shift, he was on duty the whole time.  (*See, e.g., id.* at 40:13 – 41:4) (describing patient care needs that he was expected to address during his sleeping hours). He further testified that he almost never had more than five hours' uninterrupted sleep, because "every three hours [he] would have to turn [BM] because he can't lay on one side for too long;

he's going to get bed sores." (*Id.* at 39:2-4.)  He added that while he slept "roughly maybe four and a half to five hours" on some nights, "there are nights that I don't even get to sleep at all." (*Id.* at 65:5-13.)

The Defendants argue that the parties had an agreement to exclude sleep time (ECF No. 119, at 2), but this argument is unpersuasive, for several reasons.  To begin with, the written employment agreement does not unambiguously say so.  (*See* Pl.'s Hrg. Ex. 5.)  While the agreement does say that "[a]ll shifts include sleep time," that statement could be read either way, and indeed the parties do read it differently.  Whereas Ms. Johnson says that "[a]ll shifts include sleep time" means that the Plaintiff was "not paid for sleep time" (Day 1 Hrg. Tr. at 105:10-16), the Plaintiff says that "once I'm working I should be paid regardless whether I'm sleeping or not." (*Id.* at 66:1-7.)  Second, the Department of Labor regulations do not appear to permit such agreements for shifts of less than twenty-four hours, *compare* 29 C.F.R. § 785.21 *with* § 785.22, and accordingly the claimed agreement, even if proven, would not apply to the Plaintiff's weekday shifts.  Third, even if the parties had an agreement to exclude sleep time for shifts of twenty-four hours or more, such an agreement is valid only if "adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep."  29 C.F.R. § 785.22(a).  Here, the Plaintiff credibly testified that his sleep was frequently interrupted.  (*E.g.*, Day 1 Hrg. Tr. at 39:2-4.)  In summary, there is probable cause to believe that, after being instructed on the applicable law, the finder of fact will conclude that the Plaintiff should be compensated for 133 hours in each normal work week.

### 3.    *Rate of compensation*

Under the overtime provisions of the FLSA and the CWA, determining whether the Plaintiff was "properly compensated" requires calculation of his "regular rate" of pay.  *See* 29

U.S.C. § 207(a)(1); Conn. Gen. Stat. § 31-76c; *Kinkead v. Humana at Home, Inc.*, 450 F. Supp. 3d 162, 178 (D. Conn. 2020) ("In order to calculate any overtime wages owed, [the Court] must first determine the 'regular rate' received by plaintiffs.").  "Where an employee earns a fixed salary, 'the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate.'" *Ge Chun Wen v. Hair Party 24 Hours Inc.*, No. 15-cv-10186 (ER) (DF), 2021 WL 3375615, at *10 (S.D.N.Y. May 17, 2021) (quoting 29 C.F.R. § 778.113(a)).

Here, it is clear that the Plaintiff's $1,000 weekly salary was "intended to compensate" all 133 hours.  The written agreement described a 133-hour "base schedule," for which he would receive a "base compensation rate" of $1,000 per week.  (Pl.'s Hrg. Ex. 5.)  Moreover, the Plaintiff testified that he understood it that way from the outset; he explained that when he came on board, Ms. Johnson set the 133-hour schedule and told him that "she was going to give [him] a base pay of a thousand dollars a week."  (Day 1 Hrg. Tr. at 22:19-23:3.)  Citing *Estanislau v. Manchester Developers, LLC*, 316 F. Supp. 2d 104, 108 (D. Conn. 2004), his counsel argues that his $1,000 weekly salary should be regarded as compensating only the first forty hours each week (ECF No. 79-2, at 13), which would result in a regular rate of $25.00 per hour and a six-figure overtime claim.  (*See* ECF No. 79-1 at 28.)  But *Estanislau* merely held that "[t]here is a rebuttable presumption that a weekly salary covers 40 hours."  316 F. Supp. 2d at 108.  Where, as here, a plaintiff actually testifies that he understood his fixed salary to cover all hours worked, his regular rate is calculated by dividing the salary by that number of hours.  *See, e.g., Fuk Lin Pau v. Jian Le Chen*, No. 3:14-cv-841 (JBA), 2015 WL 6366508, at * (D. Conn. Oct. 21, 2015) (calculating regular rate of pay using 80.5-hour work week, rather than forty-hour week, because plaintiff testified that he understood his schedule to be 80.5 hours).

In this case, dividing the Plaintiff's salary by the "number of hours which the salary is intended to compensate" yields a regular rate of $1,000/133, or $7.52 per hour.  This is above the federal minimum wage of $7.25 per hour, but below the then-applicable Connecticut minimum wage of $10.10 per hour for straight time and $15.15 per hour for overtime.  Consequently, there is probable cause to believe that New Horizons violated the CWA, and that the Plaintiff will recover $2.58 ($10.10 minus $7.52) for each straight time hour worked, and $7.63 ($15.15 minus $7.52) for each overtime hour worked.  *See, e.g., Hernandez v. Jrpac, Inc.*, No. 14-Civ.-4176 (PAE), 2016 WL 3248493, at *32 (S.D.N.Y. June 9, 2016) (indicating that the court would use statutory minimums to calculate damages where regular rate fell below minimum).

### 4.    *Summary of the Plaintiff's wage claims*

The Plaintiff's tenure at New Horizons lasted 71.5 weeks.  (Day 1 Hrg. Tr. at 27:12-14 (stating that his employment began on December 16, 2017); 71:23-24 (stating that his employment ended on May 1, 2019).)  He acknowledges that he took two weeks off in March, 2018.  (ECF No. 79-2, at 11.)  He also concedes that he did not work his full 133-hour schedule in seven of the remaining 69.5 weeks.  (*Id.*)  The Defendants do not seriously challenge his recollection of his time off (*see* ECF No. 119), and in any event plaintiffs are generally entitled to rely on their recollection in these matters.  *Arasimowicz*, 948 F. Supp. 2d at 224.  Accordingly, there is probable cause to believe that the Plaintiff will recover the sums depicted in the chart on the following page:

| Period Beginning | **A** No. of Straight Time Hours | **B** No. of Overtime Hours | **C** Straight Time Shortfall (A x $2.58) | **D** Overtime Shortfall (B x $7.63) | **E** Total Shortfall (A + B) |
|---|---|---|---|---|---|
| 3/25/2018 | 40 | 69 | $103.20 | $526.47 | $629.67 |
| 5/31/2018 | 40 | 35 | $103.20 | $267.05 | $370.25 |
| 8/23/2018 | 40 | 35 | $103.20 | $267.05 | $370.25 |
| 9/9/2018 | 40 | 52 | $103.20 | $396.76 | $499.96 |
| 9/16/2018 | 40 | 69 | $103.20 | $526.47 | $629.67 |
| 11/26/2018 | 40 | 35 | $103.20 | $267.05 | $370.25 |
| 4/28/2019 | 40 | 28 | $103.20 | $213.64 | $316.84 |
| Remaining 62.5 Weeks | 2,500 (40 x 62.5) | 5,812.5 (40 x 93) | $6,450.00 | $44,349.38 | $50,799.38 |
| | | | Grand Total: | | $53,986.27 |

Finally, the Plaintiff says without contradiction that he did not receive his $1,000 salary for the last two weeks of his employment. (Day 1 Hrg. Tr. at 71:15-22.) The court therefore concludes that there is probable cause to believe that he will recover $55,986.27 on his wage claims.

### 5.   *Liquidated damages*

Both the FLSA and the CWA permit a plaintiff to recover liquidated damages in an amount equal to his unpaid wages. *See* 29 U.S.C. § 216(b); Conn. Gen. Stat. § 31-68(a); Conn. Gen. Stat. § 31-72; *see also Fuk Lin Pau*, 2015 WL 6386508, at *9. Specifically, the FLSA provides that "[a]ny employer who violates" the Act's minimum wage or overtime provisions "shall be liable to the employee . . . in the amount of their unpaid minimum wages, or their overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The CWA provides that "if any employee is paid by his or her employer less than the minimum fair wage or overtime wage to which he or she is entitled," "such employee shall recover, in a civil action . . . twice the full amount of such minimum wage or overtime wage less any amount actually

paid to such employee by the employer."  Conn. Gen. Stat. § 31-68(a)(2); *see also* Conn. Gen. Stat. § 31-72.

Awards of liquidated or double damages are not mandatory under either statute.  Under the FLSA, an employer may avoid such an award if she "shows to the satisfaction of the court that the act or omission giving rise to [the plaintiff's] action was in good faith and he had reasonable grounds for believing that his act or omission was not in violation of" the Act.  29 U.S.C. § 260; *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).  And the CWA similarly provides that an employer can escape an award of double damages if "the employer establishes that the employer had a good faith belief that the underpayment of such wages was in compliance with the law."  Conn. Gen. Stat. § 31-68(a)(2); *see also* Conn. Gen. Stat. § 31-72; *Rodriguez v. Kaiaffa, LLC*, No. X03-HHD-CV-17-6088349-S, 2021 WL 4775624, at *9 (Conn. Super. Ct. Sept. 13, 2021).

Yet if the employer seeks to avoid liquidated or double damages, it bears the burden to prove its good faith.  Under the FLSA, "[t]he employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception."  *Herman*, 172 F.3d at 142; *see also Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).  And under the CWA, it is likewise the employer "who must prove good faith to avoid double damages."

In this case, there is probable cause to believe that the Plaintiff will recover liquidated damages.  As the Defendants concede, they "bear[] the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness."  (ECF No. 119, at 11) (quoting *So. New England Telecomms. Corp.*, 121 F.3d at 71).  Put differently, "[t]o establish 'good faith,' a defendant must produce 'plain and substantial evidence of at least an honest

intention to ascertain what the Act requires and to comply with it.'" *So. New England Telecomms. Corp.*, 121 F.3d at 71 (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)).    Here, no defense witness came forward with persuasive evidence that would demonstrate subjective good faith or objective reasonableness.  Ms. Johnson testified that New Horizons failed to pay overtime not because it had informed itself on the law and concluded that it could do so, but rather because the company was "not reimbursed overtime by the State."  (Day 1 Hrg. Tr. at 94:1-2.)  Although she was one of the people responsible for regulatory compliance, she testified that at the time of the Plaintiff's employment, she had not bothered to inform herself "of any legal restrictions on which employees are required to be paid overtime wages."  (*Id.* at 94:6-8.)  She evidently thought that New Horizon could avail itself of the "companionship services" exemption from the wage and hour laws (*see id.* at 106:15-21) (suggesting that the overtime rules might not apply to New Horizon's employees "because we're not a health care company"), but the Department of Labor had eliminated this exemption for agencies like New Horizons nearly three years before. 29 C.F.R. § 552.109 (effective Jan. 1, 2015) ("Third party employers of employees engaged in companionship services . . . may not avail themselves of the minimum wage and overtime exemption.").  As one of the people responsible for compliance, she should have known this.  The fact that she did not suggests that there was no "honest intention to ascertain what the Act requires and to comply with it."[3]  *Wilamowsky*, 833 F.2d at 19.

---

[3]      The Defendants say that they "consulted with an attorney" before entering into the employment agreement, and they cite this as proof of their "belief that the salary arrangement with Plaintiff was permissible."  (ECF No. 119, at 11.)  But the testimony did not establish that they did, in fact, consult with an attorney.  When asked whether "an attorney was consulted before the letter was issued," Ms. Lesinsky testified that she "believe[d] so," but couldn't be "positive, because [she] wasn't part of the process."  (Day 2 Hrg. Tr. at 34:21-35:3.)  Ms. Johnson did not testify on this point.

### 6.  *The Plaintiff's claim for attorneys' fees*

Under both the FLSA and the CWA, successful plaintiffs can recover "reasonable" attorneys' fees. 29 U.S.C. § 216(b); Conn. Gen. Stat. §§ 31-68, 31–72.  In the case of the FLSA, an award of reasonable attorneys' fees is mandatory.  29 U.S.C. § 216(b) ("The court . . . *shall* . . . allow a reasonable attorney's fee. . . .") (emphasis added); *Christianburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 415 & n.5 (1978); *Davis v. Ching Yi Cheng*, No. 16-cv-1354 (ADS) (SIL), 2017 WL 6622545, at *14 (E.D.N.Y. Dec. 28, 2017) ("Section 216(b) makes fees mandatory for prevailing plaintiffs.").   The CWA provides that a successful plaintiff may recover "such reasonable attorneys' fees as may be allowed by the court."  Conn. Gen. Stat. § 31-68(a).

"As a general matter, the starting point in analyzing whether claimed attorneys' fees are appropriate is the lodestar." *Yuajian Lin v. La Vie en Schezuan Rest. Corp.*, No. 15-cv-09507 (DF), 2020 WL 1819941, at *2 (S.D.N.Y. Apr. 9, 2020) (citing *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)) (internal quotation marks omitted).  The "lodestar" is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea*, 658 F.3d at 166.  "The reasonable hourly rate is the rate a paying client would be willing to pay," and most paying clients seek out "counsel whose rates are consistent with those charged locally." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).  Thus, "[w]hen an attorney's requested hourly rate is higher than the rates found to be reasonable in the relevant market, it is within the Court's discretion to reduce the requested rate." *Yuajian Lin*, 2020 WL 1819941, at *2 (citing *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)).  As to the second factor in the lodestar analysis – the "reasonable number of hours required by the case" – courts consider, among other things, the quality of the representation and the complexity of the case. *Arbor Hill*, 522 F.3d at 184.  In any event, the party

seeking fees bears the burden of demonstrating that its request is reasonable, and must provide the Court with enough information to assess its application.  *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

In this case, the Plaintiff asks the court to include attorneys' fees of $113,274 in his prejudgment remedy.  (ECF No. 120, at 9.)  In support of this request, he submitted a thirty-page exhibit composed of his lawyers' time records, with the "external narrative" field redacted for privilege purposes.  (Pl.'s Hrg. Ex. 23.)  The exhibit reveals that Attorneys Mark Carey and Elizabeth Swedock claim hourly rates of $525 and $395, respectively.  (*Id.*)  The Plaintiff also claims an initial hourly rate of $350 – rising to $395 on February 21, 2020 – for Attorney Donna-Marie Woodstock, who left the firm and withdrew from the case in April, 2021.  (*Id.; see also* ECF No. 32.)  The exhibit also discloses that the Plaintiff's lawyers spent at least 267 hours on the case between October, 2019 and August, 2021.  (Pl.'s Hrg. Ex. 23.)  Finally, the Plaintiff testified at the hearing that he had been billed "in excess of a hundred thousand" dollars (Day 2 Hrg. Tr. at 12:13-15), and that he had "actually paid out-of-pocket . . . [o]ver 50 thousand."  (*Id.* at 18:4-6.)

While the privilege redactions have prevented the court from conducting a line-by-line analysis of the reasonableness of the Plaintiff's fee claim, it seems clear that the claim is overstated on both components of the lodestar calculation.  With respect to "reasonable rates," courts in this district have generally approved hourly rates of between $300 and $400 for experienced partner-level employment law attorneys like Attorney Carey.  *E.g., Wei v. Sichuan Pepper, Inc.*, No. 3:19-cv-525 (JBA) (TOF), 2022 WL 385226, at *17 (D. Conn. Jan. 17, 2022), *report and recommendation adopted*, 2022 WL 382019 (D. Conn. Feb. 7, 2022) (collecting cases).  They have likewise approved rates of between $125 and $225 per hour for associate-level attorneys like Attorneys Swedock and Woodstock.  *Id.*  Attorney Carey's claimed rate is therefore at least 30%

higher than the rate he is likely to be awarded at the end of the case, and Attorney Swedock's and Attorney Woodstock's rates may be more than 100% higher.  With respect to "reasonable hours," spending 267 hours to take the case only halfway through the discovery phase is quite unusual, and may considerably exceed what is reasonable.  Moreover, all of the work in the case has been done by attorneys and none by paralegals, and Attorney Carey worked nearly a third of the hours claimed.  Courts have reduced attorneys' fee claims when the claimant could not adequately defend "the reasonableness of the distribution of the work between partners, associates and paralegals." *Wei*, 2022 WL 385226, at *20.

As noted above, prejudgment remedy proceedings are not intended to be exercises in "mathematical precision."  *FloodBreak, LLC,* 520 F. Supp. 3d at 174.  For this reason – and also because attorneys' fees are a moving target until the case ends – courts often do not attempt exact, line-by-line calculations of the lodestar amount in ruling upon prejudgment remedy applications, but instead use less detailed estimates.  In *Martinez v. Young & Son Remodeling, LLC*, for example, the court did not conduct a line-by-line analysis but instead "estimated" that the plaintiffs would likely incur $10,000 in fees for his small, one-plaintiff wage and hour case.  No. 3:12-cv-1090 (JAM) (HBF), 2013 WL 1342284, at *6 (D. Conn. Apr. 2, 2013).

In this case, there is probable cause to believe that the Plaintiff will prove a wage and hour violation, and by extension there is probable cause to believe that he will recover his reasonable attorneys' fees.  *See, e.g.,* 29 U.S.C. § 216(b) ("The court . . . *shall* . . . allow a reasonable attorney's fee. . . .") (emphasis added); *TES Franchising, LLC*, 286 Conn. at 147 ("[A] prejudgment remedy may include an award of attorney's fees only if a party can demonstrate probable cause that she will recover attorney's fees at trial.").  But there is reason to believe that his $113,274 attorneys' fee claim may be overstated by more than half.  At least some of his attorneys are claiming hourly

rates that may be double the amount that they are likely to be awarded at the end of the case. And while there may be explanations for some of the unusual number of hours claimed,[4] it seems likely that there will be an across-the-board reduction of "a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 57 (S.D.N.Y. 2015). Considering all of the circumstances, the Plaintiff has not shown probable cause for believing that more than $30,000 will be awarded for the work reflected in his Hearing Exhibit 23.

### 7.     *The Defendants against whom the prejudgment remedy should enter*

The Plaintiff contends that the prejudgment remedy should enter against Ms. Lesinsky and Ms. Johnson as well as New Horizons, because he claims that they qualify as "employers" under the wage statutes. "To be held liable under the FLSA, a person must be an 'employer,' defined broadly as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" *Sikiotis v. Vitesse Worldwide Chauffeured Servs., Inc.*, 147 F. Supp. 3d 39, 45 (D. Conn. 2015) (quoting 29 U.S.C. § 203(d)). "When determining whether an individual or an entity is an 'employer' under the FLSA, courts evaluate the 'economic reality' of the relationship by focusing on 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work scheduled or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 45-46 (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). "No one of the four factors standing alone is dispositive," because "the 'economic reality test encompasses the totality of the circumstances." *Herman*, 172 F.3d at 139. Relatedly, "[t]he lack of one *Carter* factors is not fatal"

---

[4]     For example, the Defendant filed – and the Plaintiff felt constrained to oppose – a motion to compel arbitration. (ECF Nos. 13, 14.) That does not happen in every case, and it no doubt contributed to the unusual number of hours expended by the Plaintiff's lawyers.

to a Plaintiff's claim against an individual defendant.  *Fermin v. Las Delicias Peruanas Rest.*, 93 F. Supp. 3d, 19, 36 (E.D.N.Y. 2015).

The CWA "employs a somewhat different definition of 'employer' than the FLSA." *Tapia v. Mateo*, 96 F. Supp. 3d 1, 5 (D. Conn. 2015).  "The relevant Connecticut statutes define employer as an individual or legal entity who 'employs any person' or who acts in an employer's interest in relation to employees." *Lin v. W & D Assocs., LLC*, No. 3:14-cv-164 (VAB), 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015) (citing Conn. Gen. Stat. §§ 31-58(d), 31-71a(1)) (brackets omitted). "In fleshing out this definition, the Connecticut Supreme Court has declined to adopt the 'economic reality test' that applies to the FLSA." *Id.* (citation and quotation marks omitted).  As explained by that court, for purposes of the CWA, the term "employer" "encompasses an individual who possesses the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so."  *Butler v. Hartford Tech. Inst., Inc.*, 243 Conn. 454, 462 (1997).

Applying these principles to this case, the court concludes that the Plaintiff has not shown probable cause to believe that Ms. Lesinsky is an "employer" under either the FLSA or the CWA. Ms. Lesinsky testified that she opened New Horizons in 2010 (Day 2 Hrg. Tr. at 21:8-10), but then opened a day care center in 2014.  (*Id.* at 21:4-7.)  Since then, she "went full time with the day care" (*id.*), and became "very hands off" at New Horizons.  (*Id.* at 20:5-6.)  She acknowledged that she is still "the technical owner of the company" (*id.*), but she testified that her sole role is to type and sign payroll checks based on inputs from Ms. Johnson and Ms. Carswell.  (*Id.* at 22:7-16.)  In particular, she denied having any role in hiring, firing, or setting employee compensation levels (*id.* at 22:17-22), and she also denied having any role in drafting the Plaintiff's employment agreement.  (*Id.* at 25:7-19.)  The Plaintiff argues that it is enough that she owned the company,

signed its checks, and occasionally reviewed compensation spreadsheets, but he cites no authority for that proposition. Indeed, the authorities appear to be to the contrary. *E.g., Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013) ("Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status."); *Gray v. Powers*, 673 F.3d 352, (5th Cir. 2012) (holding, in an opinion cited with approval by the Second Circuit in *Irizarry*, that signing company checks does not make an owner an "employer" under the FLSA).

Conversely, the Plaintiff has shown probable cause to regard Ms. Johnson as an employer. Ms. Johnson testified that she had the power to hire employees. (*See* Day 1 Hrg. Tr. at 77:17-20) ("I would be the, um, for the most part, the final say as far as hiring."). And while she attempted to disclaim the power to set employee schedules (*id.* at 103:23-104:2), the court does not credit this testimony, because she authored the very employment agreement in which the Plaintiff's schedule was set. (*Id.* at 92:9-10.) She also set his compensation, as evidenced by the fact that she negotiated the profit-sharing agreement along with Ms. Carswell. (*Id.* at 104:24-105:2.) While neither party elicited testimony from her about her role in keeping the company's records, "[t]he lack of one *Carter* factors is not fatal" to a Plaintiff's claim against an individual defendant. *Fermin*, 93 F. Supp. 3d at 36. Considering all of the record evidence, Ms. Johnson satisfies three of the four factors, and meets the FLSA's "economic reality" test for employer status. And principally because she negotiated and drafted the employment agreement in which the Plaintiff's hours and compensation were set, she meets the CWA's test as well. *Butler*, 243 Conn. at 462.

Yet there is an additional wrinkle in Ms. Johnson's case. As the Defendants point out, the Plaintiff served New Horizons with the initial complaint on March 10, 2020 (ECF No. 7), but did not serve Ms. Johnson until April 5, 2021. (Return of Service, ECF No. 36.) The statute of

limitations for FLSA and CWA claims is two years.  29 U.S.C. § 255, Conn. Gen. Stat. § 52-296.

The FLSA – but not the CWA – allows plaintiffs to recover up to three years of unpaid wages if

they demonstrate that the employer's violation was "willful."  29 U.S.C. § 255(a).  Thus, it would

seem that the Plaintiff can recover a narrower range of damages from Ms. Johnson than from New

Horizons.  If her violations are deemed "willful," the Plaintiff can recover damages from April 5,

2018 onward; if they are not, he can recover only from April 5, 2019.

The question of whether an employer acted "willfully" for statute of limitation purposes is

analyzed differently than the question of whether she lacked good faith for liquidated damages

purposes.  "An employer willfully violates the FLSA when it 'either knew or showed reckless

disregard for the matter of whether its conduct was prohibited by' the Act."  *Young v. Cooper*

*Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486

U.S. 128, 133 (1988)).  "To show that an FLSA violation is willful, an employee must prove that

the employer was more than negligent."  *Saunders v. City of N.Y.*, 594 F. Supp. 2d 346, 358-59

(S.D.N.Y. 2008).  Indeed, even if "an employer acts unreasonably, but not recklessly, in

determining its legal obligation, its action should not be considered willful."  *Parada v. Banco*

*Industrial de Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014).

Courts have observed that it can sometimes be difficult to draw a precise line between

unreasonableness and recklessness.  *See, e.g., Foster v. City of N. Y.*, No. 14-Civ.-4142 (PGG),

2017 WL 11591568, at *40 (S.D.N.Y. Sept. 30, 2017) (observing "difficulty in discerning . . .

whether unlawful conduct is on the one hand negligent or unreasonable, or on the other hand

knowing or reckless").  Nevertheless, some common themes emerge from the cases.  Courts often

regard employers as having acted willfully when they pay employees in cash, and when they do

not provide proper tax documentation.  *E.g., Shu Qin Xu v. Wai Mei Ho*, 111 F. Supp. 3d 274, 279-

80 (E.D.N.Y. 2015); *D'Arpa v. Runway Towing Corp.*, No. 12-CV-1120, 2013 WL 3010810, at

*4 (E.D.N.Y. June 18, 2013).  "Lack of posted notices of FLSA and [state law wage-and-hour]

rights can also support a finding of willfulness."  *Shu Qin Xu*, 111 F. Supp. 3d at 280 (citing

*Zhengfang Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184, 200 (E.D.N.Y. 2012)).  And, of

course, courts typically conclude that employers act willfully when they know that they are

required to pay overtime to a particular employee yet fail to do so.  *E.g., Doo Nam Yang*, 427 F.

Supp. 2d at 337-38 (S.D.N.Y. 2005) (finding that employer acted willfully when he "repeatedly

stated that he knew that he was required to pay the overtime premium . . . [yet] did not include

such a premium" in employee's pay).

       In Ms. Johnson's case, none of the classic indicia of willfulness are present.  She did not

pay the Plaintiff's salary "off the books;" instead, the company provided him with an earnings

statement for each pay period.  (*See, e.g.*, Pl.'s Hrg. Ex. 11, at Bates p. NHE 000170.)  The Plaintiff

also introduced no evidence that the Defendants failed to post or otherwise provide him with

FLSA/CWA notices.  And Ms. Johnson testified that she did not know that the Plaintiff was

entitled to overtime, because she apparently believed that persons who performed the Plaintiff's

job functions were exempt.  (Day 1 Hrg. Tr. at 94:6-8, 106:15-21) (explaining that she thought "he

wasn't considered" a non-exempt "health care" provider, and suggesting that she thought

"companionship services" providers were still exempt).  While it was certainly negligent of her

not to know that the Department of Labor had changed the regulations respecting companionship

services more than two years before (*see* 29 C.F.R. §§ 552.6, 552.109), on the record before the

court, this does not appear to reach the level of recklessness.

       Having thus concluded that the Plaintiff has not yet shown probable cause to believe that

Ms. Johnson's violation was willful, the court agrees with the Defendants that the wage violation

component of her prejudgment remedy should be limited to "unpaid wages for the period between April 5, 2019 and May 1, 2019." (ECF No. 119, at 9.) There are 3.86 weeks between those two dates, and for each week, the Plaintiff will likely recover a straight time shortfall of $103.20 (40 hours times $2.58) and an overtime shortfall of $709.59 (93 hours times $7.63). (*See* discussion, Section III.B.4 *supra*.) Multiplying the sum of $103.20 and $709.59 times 3.86 yields a figure of $3,137.37.

C.      **The Plaintiff's Profit-Sharing Claim**

The parties agree that the Plaintiff's compensation package included a profit-sharing component. In his amended complaint, the Plaintiff alleged that he was to be paid a percentage "of the total annual amount of the client contract (after expenses), which amount was to be paid to Plaintiff on a quarterly basis on or before thirty (30) days after the end of each quarter." (Am. Compl., ECF No. 29, ¶ 35.) The Defendants concede that his compensation included "a percentage of the net profits received by New Horizon Enterprises, LLC for the care of BM." (Ans. to Interrog. No. 7, Pl.'s Hrg. Ex. 12, at 7-8.)

The parties disagree on the Plaintiff's percentage share, and on the expenses that New Horizons could permissibly deduct. The Plaintiff says that his share was forty percent of the State contract for BM's care, after deducting only "the expenses of [his] salary and the compensation for the people who relieved [him] when [he] was not on shift." (Day 1 Hrg. Tr. at 45:7-19.) The Defendants variously say that the Plaintiff's share was either fifteen or thirty percent, and that they could deduct more than just the Plaintiff's salary and the wages of the people who relieved him. (*Id.* at 108:10-109:12.) Ms. Johnson testified that New Horizons paid BM's rent and utilities, and that it was permitted under its deal with the Plaintiff to deduct rent and utilities before calculating his share of the profits. (*Id.* at 108:14-22.) She also contended that New Horizons could deduct

26

payroll taxes paid on account of the relief workers, and also "administrative costs" such as "meetings" and "paper work."  (*Id.* at 108:23-109:9.)  Both parties acknowledge that they never put the deal in writing.  (*E.g., id.* at 45:24-25.)

The court does not credit the Defendants' hearing testimony about the Plaintiff's percentage share.  Ms. Johnson initially claimed that the "profit sharing arrangement" was "30 percent with him and 70 percent with" New Horizons.  (*Id.* at 80:16-19.)  Yet minutes later she recanted this testimony, saying that she may have "misspoke[n] on that," and claiming that "it may have been 15" percent.  (*Id.* at 96:18-25.)  She added that "it's been so long" since the deal was negotiated, and consequently she was "just not sure."  (*Id.*)  Ms. Lesinsky's testimony was similarly self-contradictory and incredible.  She initially testified that she "believe[]" the Plaintiff's profit-sharing percentage "was 15 percent" based on an e-mail that she had received from Ms. Carswell.  (Day 2 Hrg. Tr. at  29:17-21.)  But then she, too, recanted her testimony.  On the very next transcript page, she stated that the Plaintiff's profit-sharing percentage "was 30 percent not 15 percent."  (*Id.* at 30:3-5.)

While the Plaintiff struck the court as more credible than Ms. Johnson and Ms. Lesinsky, important parts of his testimony nevertheless do not add up.  He repeatedly stated that his goal in leaving Employment Options for a job at New Horizons was to achieve total compensation of $100,000 per year.  (*E.g.*, Day 1 Hrg. Tr. at 22:14-18.)  He also stated that he understood the value of the BM account to be "around . . . $250,000."  (*Id.* at 25:5-12.)  Thus, it would seem that the Plaintiff was seeking *total* compensation amounting to forty percent of the account – not forty percent *in addition to* a $52,000 annual salary.  If he were to recover a forty percent share of the profits in addition to a $52,000 salary, he would be recovering about sixty percent of the total account, but he does not claim to have even asked for sixty percent total compensation during the

negotiations.  (*See id.* at 22:14-18) ("I wanted . . . like a hundred thousand a year.  And then what I told [Ms. Johnson], 'This is the case.  This is what I want as percentage, which is forty percent.'  That is what I wanted.").

Moreover, the Plaintiff did not come forward with sufficient evidence on deductible expenses, and by extension he did not adequately support his net figure.  The Defendants say that New Horizon charged the State $313,326.02 over the Plaintiff's 16.5-month term of employment (Ans. to Interrog. 11, Pl.'s Hrg. Ex. 12, at 9), and the Plaintiff says that the only permissible expense deductions from this gross figure were his own salary and the wages of the workers who relieved him during the 35 hours a week that he was not on duty.  (ECF No. 104-1., at 4-5.)  He claims to be able to calculate the cost of his relief by multiplying their $14.00 hourly wage times 35, and then multiplying again by the number of weeks he worked for New Horizons.  (*See id.*)  But he did not submit competent evidence of the $14.00 figure, and he also does not include the nine weeks in which he took time off.  (*See* discussion, Section III.B.2 *supra.*)

The court accordingly concludes that the Plaintiff has not yet shown probable cause to believe that he will win a judgment on his profit-sharing claims.  To put it in the form of the mathematical equation $(A-B)/C$, where A is the gross billings on the BM account, B the allowable expense deductions, and C the profit-sharing percentage, the Plaintiff has not yet come forward with sufficient evidence of B, and his claims about C appear contradicted by his testimony about his compensation needs.  He concedes that the Defendants did pay him at least $28,131 in profit-sharing (ECF No. 104-1, at 4), and his Hearing Exhibit 11 appears to suggest that the sum might be as high as $36.498.09.  Without more information on B, and without a better explanation of how a forty percent figure for C squares with his other testimony, the court cannot confidently say that the Defendants have underpaid him on this element of his compensation package.  Perhaps he

will prevail on his profit-sharing claim at trial by submitting better support for B, and a better explanation on C. But on the current record, he has failed to demonstrate probable cause.

**D.      Interest and Other Issues**

The Plaintiff asks the court to include pre- and post-judgment interest in his prejudgment remedy. (ECF No. 79-2, at 14; ECF No. 104-1, at 3, 5.) "Prejudgment interest may be included in the calculation of a prejudgment remedy." *McCarter & English LLP v. Jarrow Formulas, Inc.*, No. 3:19-cv-1124 (MPS) (SALM), 2020 WL 2528508, at *13 (D. Conn. Mar. 3, 2020) (citing *New England Health Care Empls. Welfare Fund v. iCare Mgmt., LLC*, 792 F. Supp. 2d 269, 287 (D. Conn. 2011)). "The moving party must establish probable cause that it will receive an award of prejudgment interest in order for that interest to be included in the prejudgment remedy." *Id.* (citing *Garnet Analytics, Inc. v. Diversified Sols., Inc.*, No. 3:12-cv-716 (WWE) (HBF), 2013 WL 6511940, at *8 (D. Conn. Dec. 12, 2013)).

Under the FLSA, "[i]t is well settled that . . . prejudgment interest may not be awarded in addition to liquidated damages." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988). This is because "[l]iquidated damages under the FLSA are not a penalty," but instead "a form of pre-judgment interest, and for that reason a plaintiff who prevails on his FLSA claim and receives liquidated damages may not also receive an award of interest." *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 261 (S.D.N.Y. 2008); *see also Fitzgerald v. Bondfactor Co., LLC*, No. 15-cv-6796 (CM) (FM), 2016 WL 4939082, at * (S.D.N.Y. Aug. 31, 2016) ("To allow an employee to recover unpaid wages and liquidated damages, with interest, would have the effect of allowing interest on interest.").

The CWA has no such limitation, however, and courts in this district have therefore awarded prejudgment interest in addition to liquidated damages under that statute. In *Strauch v.*

29

*Computer Sciences Corp.*, for example, the court awarded prejudgment interest on the plaintiffs' state law claims, even though it had also awarded liquidated damages. No. 3:14-cv-956 (JBA), 2018 WL 5870337, at *5-7 (D. Conn. Nov. 9, 2018) (holding that "opt-in collective members who are also part of the Connecticut Rule 23 class are entitled to liquidated damages under whichever statute provides that individual greater relief") and *7 (holding that the Connecticut class plaintiffs could recover prejudgment interest as well). And in *Wei*, the court likewise awarded both liquidated damages under the CWA and pre-judgment interest under Conn. Gen. Stat. § 37-3a. 2022 WL 385226, at *14.

Calculating prejudgment interest in wage cases can be complicated because each weekly paycheck arguably requires its own interest calculation. To avoid these difficulties, courts often employ the expedient of calculating interest on the entire sum from the midpoint of the relevant date range to the date that judgment will likely enter. *E.g., Wei*, 2022 WL 385226, at *14 (calculating interest from the midpoint of plaintiff's employment, to avoid having to perform a separate interest calculation for each week in which wages were wrongfully withheld); *Ge Chun Wen*, 2021 WL 3375615, at *19 (same); *McCarter & English LLP*, 2020 WL 2528508, at *13 (ending interest calculation at predicted date for dispositive motions).

Here, there is probable cause to believe that the Plaintiff will recover prejudgment interest at a rate of twelve percent. *See* Conn. Gen. Stat. § 31-72 (providing that, in wage actions "interest [is] calculated in accordance with . . . section 31-265); Conn. Gen. Stat. § 31-265 ("in no event shall the interest . . . be less than twelve percent per annum"); *Lockhart v. NAI Elite, LLC*, No. HHD-CV-18-6098616, 2020 WL 5261242, at *12 (Conn. Super. Ct. Aug. 5, 2020) (awarding twelve percent interest in a wage case pursuant to Conn. Gen. Stat. § 31-72)); *Stevens v. Vito's by the Water, LLC*, No. HHD-CV-15-6062506-S, 2017 WL 6045302, at *6 (Conn. Super. Ct. Nov.

9, 2017) (same).  To avoid having to perform a separate calculation for each week's withheld wages, the court will calculate the prejudgment interest portion of New Horizon's prejudgment remedy from the midpoint of the Plaintiff's employment – that is, August 24, 2018 – until September 1, 2022, since judgment is unlikely to be reached before then.  The court will likewise calculate the prejudgment interest portion of Ms. Johnson's prejudgment remedy from the midpoint of the period relevant to her – in other words, April 18, 2019 – to September 1, 2022. The court declines to include any post-judgment interest, because such an award is entirely speculative at this point.

Finally, the Plaintiff requests that his prejudgment remedy include an award of costs (ECF No. 104-1, at 5 n.4), but he has provided no information about those costs.  The docket confirms that he paid the $400 filing fee (ECF No. 1), and that sum will be included in the prejudgment remedy, but he has not documented any other recoverable costs.

## IV.   FINAL CALCULATION AND ORDER

For all of the foregoing reasons, the court calculates the amount of the prejudgment remedy that should enter in favor of the Plaintiff and against New Horizons as follows:

| | |
|---|---|
| Unpaid Wages: | $55,986.27 |
| Liquidated Damages on Unpaid Wages: | $55,986.27 |
| Prejudgment Interest:[5] | $54,114.95 |
| Attorneys' Fees | $30,000.00 |
| Costs: | $400.00 |
| Total: | $196,487.49 |

---

[5]     The court reached this number by (a) calculating the number of days between August 24, 2018 and September 1, 2022; (b) dividing that number of days by 365 to reach the number of years; (c) multiplying that number of years times twelve percent; and (d) multiplying the resulting percentage by the sum of unpaid wages and liquidated damages.

And the court calculates the amount of the prejudgment remedy that should enter in favor of the Plaintiff and against Ms. Johnson as follows:

| Unpaid Wages: | $3,137.37 |
| Liquidated Damages on Unpaid Wages: | $3,137.37 |
| Prejudgment Interest:[6] | $2,543.59 |
| Attorneys' Fees | $30,000.00 |
| Costs: | $400.00 |
| Total: | $39,218.33 |

The Plaintiff's Renewed Application for Prejudgment Remedy is therefore granted in part and denied in part. He is granted a prejudgment remedy in the amount of $39,218.33 jointly and severally against New Horizons Enterprises, LLC and Ms. Elizabeth "Betty" Johnson. He is further granted an additional prejudgment remedy against New Horizons Enterprises, LLC only, in the amount of $157,269.16 – that is, $196,487.49 minus $39,217.22. His request for entry of a prejudgment remedy against Ms. Janelle Lesinsky is denied.

This is not a Recommended Ruling. It is a ruling by a magistrate judge on a non-dispositive "pretrial matter," 28 U.S.C. § 636, and it is therefore reviewable pursuant to the "clearly erroneous or contrary to law" statutory standard of review. 28 U.S.C. § 636(b)(1)(A); *see also Aetna Life Ins. Co. v. Tooth Savers Dental Servs.*, No. 3:96-cv-570 (GLG), 1997 WL 102453, at * (D. Conn. Feb. 4, 1997) (holding that Magistrate Judge's ruling on application for prejudgment remedy was reviewable pursuant to 28 U.S.C. § 636(b)(1)(A) rather than 28 U.S.C. § 636(b)(1)(B)). As such, it is an order of the Court unless reversed or modified by the District Judge upon motion timely made.

---

[6]     The court reached this number using the process describe in footnote 5, *supra*, except that it used April 18, 2019 in place of August 24, 2018.

So ordered this 21st day of February, 2022, at Hartford, Connecticut.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge